LINDENBAUM vs. PEREZ, MISC 18-000331

































 
 MARC LINDENBAUM and PAMELA SACCO Plaintiffs, v. MIGUEL PEREZ and JEAN PACHECO, Defendants
 MISC 18-000331 
 JULY 1, 2021
MIDDLESEX, ss.
RUBIN, J.
DECISION














 Almost one hundred years ago, in Dubinsky v. Cama, the Supreme Judicial Court considered a five-foot wide passageway easement over registered land in Everett (the "Dubinsky Case," "Dubinsky Decision," and "Dubinsky Court"). 261 Mass. 47 , 51 (1927). That same passageway is once again in dispute, now before the Land Court. On July 2, 2018, Plaintiffs Marc Lindenbaum and Pamela Sacco ("Plaintiffs") filed a Complaint seeking a declaration that their property at 73A-75A Francis Street, Everett has the benefit of two adjacent five-foot wide express easements over property owned by each of defendants Jean Pacheco ("Pacheco") and Miguel Perez ("Perez"), located at 124-126 Union Street and 128-130 Union Street respectively. Plaintiffs have also claimed damages as a result of defendants' interference with those easements. Defendant Perez actively defended the case, contending that he is not personally bound by the Dubinsky Decision because the judgment in that case was not registered on his certificate of title and the easement over his property has been abandoned. Defendant Pacheco was defaulted. This court also considers whether use of the passageway easements to benefit the Plaintiffs' property (or some portions thereof) overloads those passageways. 





 For the reasons discussed in the Dubinsky Decision and as set forth below, I conclude that Pacheco and Perez are charged with notice that passageway easements across Lots 91A and 92A burden their properties because examination of the deeds, registration plans, and other documents available at the time of their purchase would have disclosed those passageway easements. Further, there is insufficient evidence to conclude Plaintiffs and their predecessors in interest abandoned either of the easements at issue. Nonetheless, I do conclude that the scope of the easements across Lots 91A and 92B is far more limited than the unfettered vehicular access sought by Plaintiffs and instead supports only pedestrian use. I also conclude that use of the easements for the benefit of the three-family dwelling on Plaintiffs' property (Lot B) overloads those easements and is therefore prohibited. 





PROCEDURAL BACKGROUND 





 On July 2, 2018, Plaintiffs filed a Complaint seeking a declaration that their property with an address of 73A-75A Francis Street in Everett (consisting of four lots, identified as Lots 91B, 92B, 95A, and Lot B, as detailed below), has the benefit of two adjacent express easements over Pacheco's and Perez's properties (identified as Lots 91A and 92A, respectively, as detailed below). Defendant Perez engaged counsel and actively defended the claims against his property, but Defendant Pacheco did not file an appearance and was defaulted on October 4, 2018. On November 21, 2018, Plaintiffs filed a Motion for Judgment on the Pleadings against Pacheco seeking to enforce against Pacheco an agreement for judgment in an earlier Malden District Court Case entered into between Plaintiffs and Pacheco's predecessor's in title. That motion was denied by the court (Piper, J.) on December 17, 2018, ruling as follows: 





 A judgment on the pleadings may enter in a party's favor only where there are no material facts in dispute on the face of the pleadings, and the undisputed facts establish, as a legal matter, that the party is entitled to a judgment. See Clark v. Metro. Distr. Comm'n, 11 Mass. App. Ct. 955 (1981). Based upon the state of the pleadings now before the Court, there are disputes as to material facts, particularly as to the question of whether defendant Jean Pacheco had actual or constructive knowledge of the agreement for judgment in the district court department with Mr. Pacheco's predecessor owners, prior to his acquisition of title and endorsement by the district court judge which plaintiff contends confirms that the Pacheco land is subject to the rights plaintiffs claim. Nothing in the record on the 12 (c) motion shows Mr. Pacheco was aware of the agreement for judgment or its provisions prior to taking title, and no memorandum of lis pendens was recorded concerning the district court action. 





Pacheco did appear as a witness at trial, but did not defend the claims against his property and Plaintiffs seek a judgment that they have an express easement over his Lot 91A. I conclude that such relief is warranted because Pacheco's deed referenced an easement, but that the easement is of limited scope, as discussed below. 





 Following discovery and attempted mediation, a final pre-trial conference was held on September 31, 2019. At that time, Plaintiffs and Perez (the "Participating Parties") agreed that four issues were ready for trial: (1) declaration of Plaintiffs' rights, if any, in each of two five (5) foot wide passageway easements running northeasterly from Union Street along the shared boundary between Perez and Pacheco's properties (Lots 91B and 92B), including the scope and uses of any such easement; (2) whether the Dubinsky Decision is dispositive of Plaintiffs' rights in one or both passageways: (3) the import of an agreement for judgment in a 2017 Malden District Court case (Docket No. 1750CV313) between Plaintiffs and Pacheco's predecessor in title [Note 1]; and (4) whether Plaintiffs abandoned their easement rights. 





 I took a view of the properties on November 1, 2019. Trial proceeded on November 7 and 8, 2019, with the assistance of a Spanish language interpreter for Perez. Testimony was suspended during the testimony of expert witness Attorney Edward Rainen, on behalf of Perez, when it became clear that all necessary title documents had not been submitted as trial exhibits. Supplemental exhibits were thereafter agreed upon by the Participating Parties, and Plaintiffs engaged an expert witness, Attorney Kathleen O'Donnell. Trial resumed on December 17, 2019, and the evidence was closed. After receipt of transcripts and the filing of post-trial memoranda, I took this matter under advisement on March 31, 2020. 





 On April 8, 2021, while the matter was under advisement, the court issued a docket entry advising that it had come to the court's attention that a title issue of potential import had not to date been the focus of the parties' briefing or argument. Specifically, the court asked whether use of the passageway easements located on Defendants' property (across Lots 91A and/or 92A) to access Plaintiffs' property (Lot 91B, 92B, 95A and/or Lot B) would overload those passageway easements, with reference to Taylor v. Martha's Vineyard Land Bank Comm'n, 475 Mass. 682 , 686 (2016); Murphy v. Mart Realty of Brockton, Inc., 348 Mass. 675 , 678-679 (1965). The court set a status conference for April 21, 2021 to consider this issue and thereafter invited file supplemental briefs on the issue. Supplemental briefs were received from each party on May 28, 2021. 





FINDINGS OF FACT 





 I make the following factual findings based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial, my view of the Property and assessment as the trier of fact of the credibility, weight and inferences reasonably to be drawn from the evidence admitted at trial, as well as the Land Court's original Registration File 21, the Land Court Survey Department File 21 and documents obtained from the Middlesex South Registry of Deeds ("Registry') of which I take judicial notice: 





The Parties and Their Properties 





 1. Plaintiffs Marc Lindenbaum and Pamela Sacco acquired title to property with an address of 73A-75A Francis Street, Everett, on or about March 1, 2013 by foreclosure deed from Federal Home Loan Mortgage Corporation, recorded at the Registry in Book 61310, Page 213 on March 1, 2013 ("Plaintiffs' Property"). On the 1947 Plan, discussed below, the Plaintiffs' Property includes four lots: Lots B, 91B, 92B, and 95A (hereinafter "73A-75A Francis Street" shall include all four lots unless otherwise noted.) Tr. Ex. 4. [Note 2] 





 2. Plaintiffs' deed describes the property as consisting of two parcels, Parcels I and II. On the 1947 Plan (and as shown in the Decision Sketch), Lots 91B, 92B, and 95A comprise Parcel I and is essentially vacant land today. Parcel I description in Plaintiffs' deed states that Parcel I is "[s]ubject to and with the benefit of restrictions in Book 1, Page 68 with Certificate of Title No. 68, so far as now in force and applicable." On the 1947 Plan (and as shown in the Decision Sketch), Parcel II is comprised of Lot B, with "the buildings thereon-situated." The Parcel II description in Plaintiffs' deed states that Parcel II is "conveyed with the benefit of rights in and over a passageway thirteen and 5/100,(13.5) feet wide leading from the granted premises to Francis Street as shown on the [1947 Plan], which passageway is to be forever kept open for all purposes for which passageways are commonly used" (the "ROW"). Tr. Ex. 4. 





 3. 73A-75A Francis Street does not have frontage on Francis Street. Rather, it is set back from Francis Street behind another house which does have frontage on Francis Street, specifically a property now known as 73-75 Francis Street. 73-75 Francis Street appears as Lot A on the 1947 Plan. Tr. Ex. 3. 





 4. 73A-75A Francis Street is accessed from Francis Street via the 13.5 foot ROW, which is currently a paved bituminous driveway. That ROW appears on the 1947 Plan as a "Right of Way 13.5 Feet Wide." As the current owner of 73-75 Francis Street, Hector Gomez ("Gomez"), explained at trial, 73-75 Francis Street can be thought of as the "Front House," whereas 73A-75A Francis Street can be thought of as the "Rear House." Tr. Vol. II, at 433-434; Tr. Ex. 13. 





 5. Defendants Jean Pacheco and Miguel Perez own two adjacent properties around the corner from 73-75 and 73A-75A Francis Street, on Union Street. As shown in the Decision Sketch, Plaintiffs' backyard abuts the backyards of Defendants' Union Street properties. 





 6. Defendant Miguel Perez acquired title to Lot 92A with an address of 128-130 Union Street, Everett, on or about May 29, 2009 from Michelly R. St. Pierre ("Perez Property"). The Perez Property appears as Lot 92A on the 1947 Plan. Although no mention is made of a passageway in Perez's deed, the deed states: "Said parcel is shown as 92A on a subdivision plan filed in the Land Registration office a copy of which is filled (sic) in the [Registry] in registration book 1318 page 44 with Certificate of Title No. 253 (plan no. 21)." Tr. Ex. 5. 





 7. Defendant Jean Pacheco acquired title to Lot 91 A with an address of 124-126 Union Street, Everett from Steven T. and Karen Meninger in July 2017 ("Pacheco Property"). Pacheco's deed describes the property with reference to Certificate of Title 253 (Plan No. 21) and states: "The above described land is subject to rights of said passageway." Although this deed was executed by the Meningers on June 8, 2017, it was not registered until July 19, 2017. The delay in registration is significant because the agreement for judgment in the Malden District Court case was executed by Plaintiffs and the Meningers on June 27, 2017, and filed until July 7, 2017. The agreement for judgment was not approved by the District Court until August 1, 2017 - after Pacheco purchased Lot 91 A and title had passed. Tr. Ex. 6. 





 8. Steven T. and Karen Meninger acquired the Pacheco Property by a deed from Steven's father Donald T. Meninger on or about December 29, 1993, as evidenced by Document No. 932301, noted on Certificate 019809, Book 1084, Page 58. This deed describes the property as "shown as Lot 91A on subdivision plan filed in the Land Registration Office, a copy of which is filed in the Registry of Deeds ... in Registration Book 3, Page 161, with Certificate of Title No. 253, (Plan No. 21)" and states "[t]he above described land is subject to rights of said passageway." Donald T. and Mary Meninger had previously acquired the Pacheco Property in 1973. Their Transfer Certificate of Title No. 144273 likewise included this same language regarding "said passageway." Tr. Ex. 7. 





Historic Configuration of the Parties' Land 





 9. The first subdivision plan laying out the parcels of land now the subject of this case (excepting Plaintiffs' Lot B) is entitled "County Park Section D, Everett. Lands of Winnisimmet Improvement Co.," dated April 1899, by H.T. Whitman and Channing Howard, Civil Engineers and Surveyors (the "1899 Plan"), filed for registration on June 10, 1899. [Note 3] That 1899 Plan shows six parcels at the intersection of Webster Avenue (now Union Street) and Malden Street, including Lots 91 and 92 abutting Webster Avenue and Lot 95 abutting Malden Street. No passageways were shown on this plan. Francis Street does not appear on the 1899 Plan, nor do the Plaintiffs' parcels with an address of 73A-75A Francis Street. The 1899 Plan was filed for registration in connection with Certificate of Title No. 68. The 1899 Plan notes: "See subsequent plan filed with Certificate No. 253." Tr. Ex. 1. 





 10. On November 24, 1899, the court issued Transfer Certificate of Title No. 68 to David E. Gould and George H. Jones as owners in fee-simple of the parcels of land shown on the 1899 Plan, specifically excepting Lots 91, 92, 94, and 95. Tr. Ex. 10. 





 11. In 1900, Lots 91, 92, and 95 were re-subdivided, each with an accompanying plan: 





 a. On February 23, 1900, the court accepted for registration a plan depicting the re-subdivision of Lot 95, into two Lots 95A and 95B. Lot 95B is larger with frontage on Malden Street (4000 square feet) and rear Lot 95A is a smaller (1831 square feet), together with a five (5) foot passageway running across Lot 95B one hundred (100) feet from Malden Street northwesterly to Lot 95A at the rear. This subdivision plan included the following language: "Subject to the restrictions shown on [the 1899 Plan]." [Note 4] Tr. Ex. 10. 





 b. On May 8, 1900, the court accepted for registration a plan depicting the re-subdivision of Lot 91 into Lot 91A (a larger front lot with frontage on Malden Street of 3,928 square feet) and Lot 91B (a smaller rear lot of 747 square feet). This subdivision depicts a single five (5) foot wide passageway running northeasterly ninety (90) feet from the street (now identified as "Union Street") along Lot 91A to Lot 91B at the rear and includes the following language: "This plan is filed in accordance with Court rule 20 of the Court of Registration and the land transferred by the deed filed with this plan is correctly shown as Lot 91A, and it is mutually agreed that the 5 ft. passageway referred to in said deed is located as shown on said plan." Tr. Ex. 10. 





 c. On September 12, 1900, the court accepted for registration a plan depicting the re-subdivision of Lot 92 into Lot 92A (a larger front lot with frontage on now-named Union Street of 3,433 square feet) and Lot 92B (a smaller rear lot of 760 square feet). This subdivision plan was filed with Certificate of Title No. 67. It shows two five (5) foot wide passageways running northeasterly ninety (90) feet across Lot 92A from the street (now identified as Union Street) to Lot 92B at the rear, one on either side of the property. That subdivision plan included the following language: "This plan is filed in accordance with Rule 20 of the 'Court of Land Registration' and we hereby signify by our signatures hereto that the boundary line between our estates is correctly shown hereon." Tr. Ex. 10. 





 12. Under Certificate of Title No. 67, dated February 27, 1901, Charles E. Kenealy ("Kenealy") took title to Lots 91, 92, 94, and 95 from David E. Gould. 





 13. Under Certificate of Title No. 252, dated March 13, 1901, Kenealy conveyed the rear lots (Lots 91B, 92B and 95A) to William Kennett ("Kennett"). 





 14. Under Certificate of Title No. 253, dated March 30, 1901, Kenealy took title to the front lots (Lots 91A, 92A, and 95B), with reference to Certificate of Title 68 and also referencing a compilation plan of that same date (Plan 21R). That compilation plan was entitled "Re-Subdivision of 'Lots 91-92-94-95' Section 'D' Everett" (the "1901 Compilation Plan"). The 1901 Compilation Plan depicted the same six lots as the 1899 Plan (Lots 91-96), now showing the subdivision of Lots 91, 92, and 95 and the four (4) passageways connecting Webster and Malden Streets to the interior or rear Lots 91B, 92B, and 95A. The Plaintiffs' parcels with an address of 73A-75A Francis Street do not appear on this 1901 Compilation Plan. Tr. Ex. 2. 





 15. On the back of the 1901 Compilation Plan, the Recorder of the Land Court included a notation filed with Certificate of Title No. 253, as follows: 





 "This plan is a compilation of lots appearing on plan filed with certificate of title No. 68 at [the Registry], and subdivisions subsequently made of lots thereon, which are here arranged together for greater convenience, and the Assistant Register ... is authorized to issue a certificate or certificates of title for said lots to those legally entitled thereto according to his Registration Book, subject to and with the benefit of restrictions and rights of way referring to or appearing hereon, together with any other registered encumbrances, upon the surrender or partial cancellation as to lots sold of present outstanding certificates. Dated this thirteenth day of March, A.D. 1901. By order of the Court. Attest: Clarence C. Smith, Recorder. Commonwealth of Massachusetts, Court of Land Registration." 





 Notably, the Recorder entered his notation on the back of the 1901 Compilation Plan on March 13, 1901, coincident with the issuance of Certificate of Title No. 252 (whereby Kenealy conveyed the rear or interior lots, Lots 91B, 92B, and 95A) to Kennett and well before the issuance of Certificate of Title 253 on March 30, 1901 (whereby Kenealy took title to the front lots, Lots 91A, 92A, and 95B). Tr. Ex. 20, p. 135; Tr. Ex. 21, p. 10; Tr. Ex. 22, p. 4. 





 16. After several intervening conveyances, Giuseppe Cama and Faustina Cama (the "Camas"), the defendants in the Dubinsky Decision, took title to Lots 91B, 92B, and 95A as set forth in Transfer Certificate of Title 433, dated November 4, 1924. 





 17. A copy of a letter in the Land Court Survey Department file, dated July 10, 1925, from the Engineer for Court to an engineer in Malden, responds to an inquiry as to whether there is a way over his client's property at on Malden Street. It states: "I find that some time ago one man owned lots 91, 92, 94 and 95 and that he redivided these lots into other lots laying out ways. A way five feet wide extends along the south side of the ... lot which is probably for the benefit of lot 95A, being in the rear." This letter indicates the Land Court considered the re-subdivision of Lots 91, 92, and 95 by Kenealy, as of July 10, 1925, to be permanent. 





 18. On September 21, 1925, Dubinsky filed the Dubinsky Case, discussed below. 





The 1947 Plan and The Plaintiffs Property/73A-75A Francis Street 





 19. On September 10, 1947, Louis and Bertha Silverman, who then owned Lots 91B, 92B, and 95A (registered land and all vacant lots), as well as Lot B (unregistered land, with a three-family dwelling thereon), sold those properties together in a single deed to Sol and Anita Kolodny. This appears to be the first time these lots came together under common ownership. [Note 5] This deed included an express right of way over a 13.5 foot wide passageway leading from Francis Street to Lot B. Tr. Vol. III, at 499-505; Tr. Ex. 20, Sheet 35. 





 20. On September 12, 1947, a plan entitled "Plan of Land in Everett, Massachusetts," by L.G. Brackett & Co., Civil Engineers, dated Aug. 4, 1947, was recorded with the Registry at Book 7815, Page 546, as Plan 1321 (the "1947 Plan"). The 1947 Plan shows a modern configuration of the parcels of land here at issue, including portions of some of the lots from the 1901 Compilation Plan (91A, 913, 92A, 92B, 95A, 95B), as well as Lots A and B and now showing Francis Street. Lot A has frontage on Francis Street, while Lot B is reached only by means of a "Right of Way 13.5 Ft. Wide, running southeast from Francis Street." Tr. Ex. 3. 





 21. The 1947 Plan shows portions of the two "passageway" easements at issue across Lots 91A and 92A to the rear or interior Lots 91B and 92B. The easements terminate at those rear lots and do not extend to the land behind Lots 91B and 92B. The 1947 Plan also depicts a "3 Family Dwelling" on Lot B, the rear porch of which appears to cross over into Lot 95A and the corner of the dwelling bounds Lot 91B. Tr. Ex. 3. 





 22. Prior to Plaintiffs' ownership, 73A-75A Francis Street was owned by Gomez and his wife Adriana, who purchased the property on or about July 9, 2001, from Robert and Ruth Maltais. That deed is recorded with the Registry at Book 33234, Page 076 and includes the same easement language. The Gomezes later sold 73A-75A Francis Street to Elmer Rubio-Garcia and Roxanna Lazo Garcia, on or about February 26, 2006, by deed recorded with the Registry at Book 47093, Page 40. Tr. Ex. 8. 





 23. On June 13, 2008, the then owners of 73A-75A Francis Street (Patrick Tchiengang and Michel Diboty) recorded a Master Deed in connection with the creation of a condominium and subjected the property to G. L. c. 183A, the Massachusetts condominium statute. On or about August 15, 2008, as a result of Land Court Subsequent Case No. 08-SBQ-21-06-001, Lots 91B, 92B and 95A (Parcel 1) was withdrawn from registration. The Master Deed is recorded with the Registry at Book 51304, Page 342. On or about November 11, 2011, U.S. National Bank, as mortgagee, executed a foreclosure deed for the property to Federal Home Loan Mortgage Corporation, recorded at Book 57886, Page 86. Tr. Ex. 9. 





 24. Plaintiffs do not live at 73A-75A Francis Street. Rather they are business partners and purchased the three-family residential rental property as an investment. Pamela Sacco's husband, David Sacco, manages 73A-75A Francis Street for the business partners, as well as a number of other residential rental properties. Tr. Vol. I, at 27-29, 37-38. 





73-75 Francis Street/the "Front House" 





 25. While owning 73A-75A Francis Street, Gomez also purchased 73-75 Francis Street, because it had frontage on Francis Street. He did so on or about January 30, 2005, by deed recorded with the Registry in Book 41934, Page 265. That deed states: "Said premises are conveyed subject to and with the benefit of a right of way 13.5 feet wide leading from Francis Street to said Lot B, to be used in common with the owner or occupant of said Lot B." Gomez owned both 73-75 Francis Street and 73A-75A Francis Street between January 30, 2005 and February 26, 2006. Tr. Ex. 8. 





Current Configuration of the Properties 





 26. As noted above, 73A-75A Francis Street does not have frontage on Francis Street. Rather, access to 73A-75A Francis Street is by way of the ROW or Driveway across the front property, 73-75 Francis Street. A path to the right of the three-family house constructed on Lot B leads from the ROW to the backyard of 73A-75A Francis Street (the backyard being Lots 91B, 92B, and 95A). The ROW bisects the Gomez Property, with the house to the left of ROW (as one is facing away from Francis Street) and a multi-bay garage constructed to the right of ROW. Tr. Vol. I, at 27-29; Tr. Exs. 3, 13. 





 27. As described aspirationally by Lindenbaum at trial, behind the three-family dwelling on Parcel B, is "a very large backyard parking area - potential parking," large enough to park several vehicles. Today, all of the backyard (Lots 95A, 91B, and 92B) is paved with bitumen. Some outdoor furniture and a basketball stand with net are now located in this backyard. Lot 95A is located immediately behind the three-family dwelling on Lot B, with a dog leg (as described by Lindenbaum) stretching behind the multi-bay garage of the Front House. Lot 91B (to the rear of Pacheco's Property) abuts Lots B and 95A, but Lot 92B (to the rear of Perez's Property) is largely contiguous only with Lot 91B (except for a small corner which touches Lot 95A). Lots 91B and 92B abut the backyards of each of the Pacheco and Perez Properties, Lots 91A and 92A, respectively. Two sheds are located in the paved backyard area. Tr. Vol. I, at 39-42, 115; Tr. Exs. 13, 23; Observations during view. 





 28. Plaintiffs' tenants cannot park in the backyard at present. Access from Francis Street is blocked by the Gomez garage and access from Union Street via the easements at issue is blocked by an old chain link fence and a new taller chain link fence running along the boundary between Plaintiffs' Property on one hand and the Perez/Pacheco Properties on the other. Observations during view. 





 29. At the time of the view, and as documented by photographic exhibits, a white vinyl fence surrounds most of Plaintiffs' backyard and a relatively new, shiny tall chain link fence (perhaps six foot high) is located behind the white vinyl fence closer to Defendants' properties. A shorter, older rusty chain link fence (approximately four foot high) was located between the white vinyl fence and the newer chain link fence. At the time of the view, there was a break of ten feet or so in the white vinyl fence so that only two chain link fences separated the parties' properties. The break is located in the area where Lots 91A and 92B abut the plaintiffs' Property and where the passageways appear on the plans. Tr. Vol. I, at 65-70; Tr. Ex 14; Observations during view.





 30. In 2009, when Perez acquired his property, the white vinyl fence and the old chain link fence were in place. At that time, according to Perez, the white vinyl fence did not have a break in it, rather Plaintiffs took down a portion of the white vinyl fence when they took down the corresponding portion of the old chain link fence. As discussed further below, I credit this testimony, which is consistent with that of Gomez. Although there may have been a gate in the old chain link fence gate, it was rusted shut and sealed shut with metal bands, such that it could not be opened by hand. Tr. Vol. I, at 261-268; Tr. Vol. II, at 341-342, 424; Tr. Ex. 23; Observations during view. 





 31. In 2013, when Plaintiffs' purchased their property, the white vinyl fence and the old chain link fence were in place. I do not credit Lindenbaum's testimony that at that time, there was a break in the white vinyl fence and in the area of the break, the chain link fence was not solid but consisted of two equal gates each approximately five feet in length that would swing open by hand. Tr. Vol. I, at 74-76, 82, 91, 146-148;Tr. Ex. 14. 





 32. The easement areas on Defendants' properties are paved as they lead from Union Street until approximately ten to twelve feet before the fences and the boundary with Plaintiffs' Property, where the paving stops and patchy grass and soil appear. Tr. Exs. 18, 23. Defendants and their family members and tenants regularly park on the paved portion of the passageways. Tr. Vol. I, at 69-70; Tr. Exs. 14, 17, 18, 19, 23; Observations during view. The backyard of Plaintiffs' Property is currently at a slightly higher elevation than the elevation of the Defendants' properties. According to Gomez, when he owned 73A-75A Francis Street, his property was two to three feet higher than it now exists and he excavated when paving, as detailed below. Tr. Vol. II, at 444-445; Observations during view. 





 33. Three tall trees are located on or near the boundary between Plaintiffs' and Defendants' properties, on the boundary with the Pacheco Property and the old metal fence goes through the middle of at least one of those trees. The trees are taller than Pacheco's house and decades old. No trees are located in the area of the Passageway. Tr. Vol. I, at 150-152, 175, 207-210; Tr. Exs. 15, 19; Observations during view. 





 34. Pacheco purchased 124-126 Union Street in July of 2017 but has never lived there because he started renovations to the property upon acquisition and then his mother became ill, such that he has spent a lot of time visiting her out of the country and decided to rent the property and live in a smaller apartment. Pacheco denied any knowledge of the Malden District Court case or agreement for judgment. He also denied knowing about the easement across Lot 91A until several months after he purchased the property when speaking with Perez. However, his deed describes the property with reference to Certificate of Title 253 (Plan No. 21) and states: "The above described land is subject to rights of said passageway." Tr. Ex. 6. 





 35. I credit Pacheco's testimony that he had no actual knowledge of the agreement for judgment or its terms prior to purchase because Meninger concurred that he never told Pacheco about the Malden District Court case or the agreement for judgment, because there was a delay after the execution of the deed to Pacheco (June 8) and its registration (July 19) during which the agreement for judgment was executed and filed (June 27 and July 17). Pacheco's testimony was unguarded, open and frank, especially during cross-examination. For instance, I conclude that he purchased Lot 92A without a personal lawyer based on his testimony and my evaluation of his credibility, including testifying to being the first in his family to purchase property, his confusion about the process, and statement that the bank's lawyer "did the whole paperwork." Pacheco also acknowledged on cross-examination that after he purchased Lot 92A he observed an opening in the fence behind his house big enough for a person to go through, observed 

 people walking through the opening to cross into Plaintiffs' Property, and acknowledged he was happy about it when Perez installed the fence and closed the opening. Tr. Vol. II, at 395-396, 404-406, 415-416. 





Plaintiffs Learn About the Passageway, the Gate and New Fence 





 36. In 2016, a few years of after acquiring their property, Plaintiffs learned about the passageways from David Sacco, who reviewed Plaintiffs' deed, came across the Dubinsky Decision and discovered Certificates of Title No. 68 and 253. Tr. Vol. I, at 52-54, 117-120; Tr. Ex. 4. David Sacco approached Pacheco and Perez who acknowledged they were aware of the passageways, but said they were only for pedestrian access. Tr. Vol. I, at 122-123. 





 37. Shortly after this research, David Sacco removed the gate panels and posts. Although testifying that he opened the gates by hand and removed the gates using a ratchet to unscrew the bolts, I discount Sacco's testimony in this regard and find to the contrary that the gates were so old and rusted and cemented in place that Sacco would have been unable to remove the gates without mechanical means such as a metal cutter. I so find in part because of the physical evidence and based on my evaluation of credibility. As to the former, a number of photographs and my observations at the view show a very rusty chain link fence. A particular photograph taken by David Sacco on or about the time that he removed the gates also shows that the ground on the Defendants' properties was grassy in the area of the Passageway, with no tire tracks or other marks of disturbance. Tr. Vol. I, at 153-160; Tr. Exs. 14, 17. In addition, Gomez testified that there was never a gate or opening in the chain link fence along the boundary with Defendants' properties and that the poles of the old chain link fence were cemented into the ground. I credit his description as accurate since he is relatively disinterested and his memory is consistent with that of Meninger, who also was relatively disinterested. [Note 6] Tr. Vol. II, at 441, 444-445. As to the latter, Lindenbaum's testimony was evasive and disjointed on cross-examination and lacking in forthrightness. I conclude he lacked credibility. Tr. Vol. I, at 68-69, 126. [Note 7] 





 38. Once the gates were removed, David Sacco left them on the ground, whereupon Perez reinstalled them. David Sacco then removed the gates again and the pieces disappeared. David Sacco cut down the metal fence in the area of the passageways four times. Perez ultimately (about a year of so prior to trial) installed a newer and taller metal chain link fence in a continuous run across the boundary with Plaintiffs' Property without a gate and cemented the poles into cinder blocks buried into the ground. Tr. Vol. I, at 78-82, 120-130, 153-162; Tr. Vol. II, at 294-298; Tr. Exs. 14, 18, 19, 23. 





Meninger's Testimony, the Malden District Court Case and the Small Claims Case 





 39. In 1991, Meninger purchased the three family residential property located at 124-126 Union Street from his father and owned the property for 17 or 18 years before selling to Pacheco. Although Meninger never lived there, his father had owned the property since 1974 (Meninger was two years out of high school at that time). His oldest daughter lived there for two years and his son for twelve years. Tr. Vol. I, at 180-184; Tr. Ex. 7. While his father owned the property, Meninger visited the property once a month. 





 40. Meninger described the backyard of the Pacheco Property as unpaved, but with a paved driveway running from Union Street to the backyard. As long as he could remember, an old metal chain link fence ran around the back and side of his property and had been there when his father purchased the property. Meninger testified that he had no memory of a gate in the old chain link fence. Tr. Vol. I, at 205-206. 





 41. Both Meninger and his father were firemen and his father referred to the passageways as a "fireman's easement." He testified, "I never gave it any thought ... because nobody ever approached us to use it." He never saw the metal fence opened or observed the easements being used to access Lots 91B and 92B. Tr. Vol. I, at 187-192. David Sacco conceded on cross-examination that Meninger told him that he was aware the Passageway existed, but that "no one has ever used it." Tr. Vol. I, at 167-168. I further credit Meninger's testimony since it is consistent with that of Gomez that the backyard of Plaintiffs' Property used to be "like a big yard, it wasn't a hot top back then." 





 42. On April 11, 2017, Plaintiffs filed a complaint in Malden District Court against Perez and the then owners of Lot 91A, Meninger and his wife Karen, regarding use of the passageways across Lots 91A and 92A. Sacco v. Perez, Malden Dist. Ct., No. 1750CV-000313 (Jan. 22, 2018). 





 43. On or about June 27, 2017, the Plaintiffs and Meningers executed an agreement for judgment in the Malden District Court case. That agreement was filed with the court on or about July 7, 2017 and approved by the court on August 1, 2017 (Archilla, J.). Therein, the Meningers acknowledged the existence of a five (5) foot wide easement leading from Union Street across their property to the backyard of Plaintiffs' Property and agreed to keep that easement free of obstructions. [Note 8] The agreement for judgment was never recorded or registered. On or about January 22, 2018, after hearing, the Malden District Court allowed Perez's Motion to Dismiss for lack of subject matter jurisdiction (Barnes, J.). Tr. Vol. I, at 216. Sacco v. Perez, Malden Dist. Ct., No. 1750CV-000313 (Jan. 22, 2018). 





 44. Meninger removed one five-foot section of the fence adjacent to his backyard at the conclusion of the Malden District Court case. He testified that he agreed to remove a portion of the fence because he wanted to sell his property without delay. Sacco concurred with these events. Tr. Vol. I at 133-134, 182-186, 215. Meninger testified: "We came to an agreement, because they tried to block me from selling my home in court and they lost. And I just wanted to get this cleared up, so I could sell the house." Meninger testified that he did not discuss the agreement for judgment with Pacheco. Tr. Vol. I, at 223-224. 





 45. In 2010, Perez filed a small claims case against Michael Diboty and Patrick Tchiengang, who owned 73A-75A Francis Street between 2008 and 2011 (before Gomez). Perez had called the police because Diboty and Tchiengang had removed the white vinyl fence and started to cut down the chain link fence. Tr. Vol. II, at 318-320, 332-334. [Note 9] 





Gomez Testimony 





 46. Gomez now lives at 73-75 Francis Street (the Front House) and owns that property, but he previously owned and lived at Plaintiff's Property (all four lots now constituting 73A-75A Francis Street or the Rear House), having purchased that property on July 9, 2001. Gomez sold the Rear House on February 27, 2006, and purchased the Front House on January 30, 2004, such that he owned both properties for more than a year. Tr. Vol. II, at 434-435; Tr. Ex. 8. 





 47. The Front House is also a three-family dwelling, which also includes the Garage (a six bay structure, with two bays and doors facing Francis Street and four bays and doors facing the ROW). Gomez now lives on the first floor of the Front House with his family. Tr. Vol. II, at 435-436; Tr. Exs. 13, 23. 





 48. When living in the Rear House, Gomez and his family lived in the second floor apartment of the three-family dwelling on Lot B and rented the other two apartments. Gomez explained that access to the Rear House was through the front door via the ROW, running from Francis Street between the Front House and the Garage. Gomez testified that since 2001 when he first purchased and took residence on Francis Street, he never observed anyone walk from the backyard of 73A-75A Francis Street to Union Street and never observed anyone drive a car from the backyard to Union Street. Tr. Vol. II, at 446-447. 





 49. When he purchased the property there was grass in the backyard, but he later paved the backyard to clean it up. His family used the backyard for birthday parties, for the children to play and the like. When he purchased the Rear House, Gomez was able to drive a car all the way to the back of the house and into the backyard via the ROW, through a pathway to the right of the house. He testified that he parked cars back there "even though I was not supposed to." Gomez explained that it is no longer possible to fit through that passageway because he blocked the passageway by installing a tall, new chain link fence atop cinder blocks when he purchased the Front House along the boundary between Lot A and Lot B (along the righthand side of the pathway leading to the backyard of Plaintiffs Property and behind the garage). Gomez explained that he installed this fence when Michal Diboty and Patrick Tchiengang owned the Rear House and "tried to force to pack a lot of cars  he used to be like a car dealer - onto th e backyard and parking on my right-of-way. So he threatened everything. So I hired a surveyor to come line the property, and I put the walls in there and the fences." As observed during the view, the location of this new fence serves to block vehicular passage via the ROW and the pathway to the right of the house on Lot B into the backyard. It is only wide enough for pedestrian access now (See Tr. Exs. 13/1 and 23/7 for the current configuration). Tr. Vol. II, at 420-424, 440. 





 50. When Gomez purchased the Rear House, the rusty, old, and damaged chain link fence (approximately four foot tall) surrounded the entire backyard. Gomez added the white vinyl fence in order to provide privacy for his family, guests and tenants at the same time as he paved the backyard. Tr. Vol. II, at 424-429, 437-438; Tr. Ex. 13. 





DISCUSSION 





 A. The Dubinsky Decision And Reference to the 1901 Compilation Plan in Perez's Deed 





 Perez contends that the Dubinsky Decision is of no consequence relative to the current dispute because the judgment was never registered on the certificate of title for Lot 92A as required by G. L. c. 184, § 17 [Note 10] and Perez had no way of knowing of its existence. Plaintiffs do not dispute that the judgment was not registered on the certificate of title for Lot 92A, but rather contend that the reasoning of the Dubinsky Decision is sound and applies equally to the current circumstances, almost one hundred years later. Plaintiffs contend that Perez, as the purchaser of registered land, had actual notice of the Lot 92A passageway based on the deeds, certificates of title and plans of record in his chain of title, just as Dubinsky had notice many years before. I begin by reviewing the Dubinsky Decision and then consider its applicability to the current dispute before the court. 





 1. The Dubinsky Decision and Judgment Entered in 1925 





 Because the Dubinsky Decision considered one of the exact same passageways now at issue, it comes as no surprise that the facts before the Dubinsky Court in 1925 were remarkably similar to those set forth above. As reported in the Dubinsky Decision, the plaintiffs filed a bill in equity in Superior Court on September 21, 1925, seeking to enjoin the defendants from passing over plaintiffs' land, while the defendant claimed a right to pass over plaintiff's land by reason of a right of way. The suit was referred to a master, who submitted a report annexing a sketch plan. The sketch plan showed a layout much like the 1901 Compilation Plan and also showing 73 Francis Street, then undivided. With reference to the 1901 Compilation Plan, the plaintiff Dubinsky owned Lot 92A, the current Perez Property. The defendants Camas owned Lots 91B, 92B, and 95A, the current Plaintiffs' Property, as well as a parcel of land numbered 73 Francis Street, which they owned before acquiring Lots 91B, 92B and 95A. [Note 11] The owner of Lot 91A (now the Pacheco Property) was not a party to the Dubinsky Decision. [Note 12] 





 As reported by the master, the 1925 dispute arose when defendants Camas undertook a survey and discovered that a hencoop had been installed on Lot 92B and a fence installed across the passageway as if Lot 92B were part of Lot 92A. [Note 13] Thus, the Dubinsky Decision considered one of the same passageways that are currently the subject of this case, specifically the five (5) foot wide passageway running from the street across Lot 92A, Perez's Property. While the 1925 fence had been erected along the boundary between Lot 95A on the one hand and Lots 91B and 92B on the other hand, in other respects the situations on the ground are remarkably similar. The current fence is erected along the actual boundary of between Lots 91B and 92B on the one hand and Lots 91A and 92A on the other hand. In both disputes, the easements were not in use and fences had been erected so as to render the passageways unavailable to the owner of the rear lots. [Note 14] 





 Not surprisingly, the title issue before the Dubinsky Court was much like that now before this court. The Dubinsky Decision references many of the same title documents now before the court, specifically those prior to 1925, including Certificate of Title Nos. 68 and 253 and the 1901 Compilation Plan. Dubinsky, 261 Mass. passim. The Dubinsky Decision considered the Certificate of Title issued to Dubinsky in December 1921, ("to lot No. 92A ... subject to the restrictions written on [the 1901 Compilation Plan] ... and to the right of way referred to and appearing on [the 1901 Compilation Plan]") and that issued to the Camas in November 1924, which refers to the 1901 Plan but "contains no mention of the rights of way shown on the [1901 Compilation Plan]." Id. at 52. The Dubinsky Court concluded: 





 The issuance of certificates of title in conformity to the [1901 Compilation Plan] and its accompanying decree had the effect of creating the rights involved in this litigation by express grant, to use the terminology of real estate law before the adoption of the system of registration of titles now set forth in G. L. c. 185, and hence whether they have continued to be or are now necessary for the enjoyment of the land of the defendants, is not of consequence, [sic] Since they did not spring into existence as ways of necessity, they do not cease as soon as the necessity ceases .... 





Id. at 55-56. [Note 15] On facts found by the master, the Dubinsky Court also concluded that plaintiff Dubinsky did not make out a claim of abandonment by the defendants of their easements as a matter of law, because "mere nonuser of an easement created by grant does not show abandonment." Perez likewise has argued that the passageway across his property, Lot 92A, was abandoned; because abandonment is a fact-specific determination, that defense is discussed below. 





 A Final Decree After Rescript issued in the Dubinsky case, ordering, adjudging, and decreeing that plaintiff Dubinsky's complaint was dismissed and that defendants Camas had a right of way over the passageway shown on the plan, as referred to and incorporated into the master's report, leading to Lots 91B and 92B and over Lot 92A, but which mistakenly also included Lot 91A in the decree. Thereafter a further order of the Supreme Judicial Court, dated October 14, 1927, instructed the clerk of the Superior Court to make the following docket entry: "Final decree to be modified by adding at the end of after the word 'plan' the words "over the lot of the plaintiff numbered 92A on said plan," and as thus modified is affirmed. Tr. Ex. 31. However, the Final Decree was never registered on Dubinsky's certificate of title for Lot 92A and does not appear within the chain of title on either registered or unregistered lands for any of the parties' properties. According to title experts Rainen and O'Donnell, the Dubinsky Decision would not have been discoverable during a title examination. Tr. Vol. III, at 558-559, 594-595. 





 2. Jackson v. Knott And Reference to the 1901 Compilation Plan 





 As the party claiming easement rights, Plaintiffs have the burden of proving its existence. Boudreau v. Coleman, 29 Mass. App. Ct. 621 , 629 (1990). See Hamouda v. Harris, 66 Mass. App. Ct. 22 , 24 (2006). While Plaintiffs acknowledge that the judgment in the Dubinsky Decision was not registered on the certificate of title for Lot 92A so as to directly encumber Perez's Property, they nonetheless urge the court to conclude that they have a right to use the passageway easements across Lots 91A and 92A, just as the Supreme Judicial Court concluded almost one hundred years ago that their predecessors in title, the Camas, had a right to use the passageways across Lot 91A and 92A. Plaintiffs rely on the first exception as articulated in Jackson v. Knott, 418 Mass. 704 , 711 (1994). 





 Perez on the other hand contends that Lot 92A is free of any easement providing access to Plaintiffs' Property consistent with the general rule for registered land that each landowner holds a certificate of title "free from all encumbrances except those noted on the certificate ...." G. L. c. 185, § 46. In addition to describing the registered land and the estate of the owner, a · judgment of registration and subsequent certificates of title "shall set forth the estate of the owner and also, in such manner as to show their relative priority, all particular estates, mortgages, easements, liens, attachments and other encumbrances, including rights of husband or wife, if any, to which the land or the owner's estate is subject ...."G. L. c. 185, § 47. "No title to registered land, or easement or other right therein, in derogation of the title of the registered owner, shall be acquired by prescription or adverse possession. Nor shall a right of way by necessity be implied under a conveyance of registered land." 

G. L. c. 185, § 53. The registration provisions of G. L. c. 185 are to be strictly construed, as they "provide a method for making titles to land certain, indefeasible, and readily ascertainable." Feinzig v. Ficksman, 42 Mass. App. Ct. 113 , 116 (1997). See Calci v. Reitano, 66 Mass. App. Ct. 245 , 247 (2006). 





 According to Perez, none of the exceptions articulated in Jackson, 418 Mass. at 711, apply under the present circumstances. The Jackson exceptions apply when facts described on the certificate of title would prompt a reasonable purchaser to investigate further, or where the purchaser has actual knowledge of a prior unregistered interest. Id. Specifically, "[i]f an easement is not expressly described on a certificate of title, an owner, in limited situations, might take his property subject to an easement at the time of purchase: (1) if there were facts described on his certificate of title which would prompt a reasonable purchaser to investigate further other certificates of title, documents, or plans in the registration system; or (2) if the purchaser has actual knowledge of a prior unregistered interest." Id. See Hickey v. Pathways Ass'n, 472 Mass. 735 , 755-761 (2015). These rules apply to registered land as well as recorded land. Duddy v. Mankewich, 75 Mass. App. Ct. 62 , 66 (2009). See Anarpet Realty Corp. v. Stutz Motor Car Company, Inc, 18 LCR 527 , 529-530 (2010) (Misc. Case No. 07 MISC 352302) (Piper, J.) (detailing the application of the Jackson principles to registered land). 





 Here, the Participating Parties dispute whether the first exception in Jackson is applicable to the present circumstances. Under this first exception, Perez is responsible for any facts which he could have ascertained by reviewing the certificate of title for Lot 92A such as would reasonably prompt further investigation into other certificates of title, documents, or plans in the registration system that may reveal an encumbrance on their property. Jackson, 418 Mass. at 711. Perez acquired his property by Quitclaim Deed, December 12, 2008, from Michelly R. St. Pierre, which was registered at the Registry in Book 1369, Page 7, as Certificate No. 244116. That deed states: "Said parcel is shown as 92A on a subdivision plan filed in the Land Registration office a copy of which is filled (sic) in the Registry ... in registration book 1318 page 44 with certificate 253 (plan no. 21)." Thus, inspection of Perez's deed provided notice of Certificate of Title No. 253, which in turn certifies title to Lots 91A, 92A, and 95B with reference to the 1901 Compilation Plan, showing the passageway easements at issue. Certificate of Title 253 specifically provides that said land (Lots 91A, 92A, and 95B) is subject to the restrictions written on said plan filed with certificate number 68." 





 Thus, I conclude that the first Jackson exception applies here, because investigation of the certificate of title referenced in Perez's deed would have provided notice of an easement and would have prompted Perez, as a reasonable purchaser, "to investigate further other certificates of title, documents, or plans in the registration system ...." Jackson, 418 Mass. at 711. See Hickey, 472 Mass. at 75557. As noted in the Dubinsky Decision: 





 The principle of construction governing the interpretation of deeds is that where mention is made of an easement as an encumbrance or as an appurtenance of the land conveyed and reference is made in the deed to a plan, the plan must be considered as part of the deed, so far as is necessary to aid in the description and identification of the easement. 





Dubinsky, 261 Mass. at 323. 





 With respect to the second Jackson exception, Plaintiffs do not contend that Perez had actual knowledge of the easement across Lot 92A. [Note 16] Perez therefore purchased his property in good faith without such knowledge. "This good faith requirement has been interpreted to mean that a title holder will not be protected by the land registration system if he has 'actual knowledge of a prior unregistered interest.'" Calci, 66 Mass. App. Ct. at 247, quoting Jackson, 418 Mass. at 711. See Feldman v. Souza, 27 Mass. App. Ct. 1142 , 1143 (1989) ("It has been the rule for forty-five years ... that if the purchaser of registered land has notice of the existence of a way over his estate, that person takes the land subject to such an easement, even if it is not mentioned as an encumbrance in the grantor's certificate of title."). 





 On behalf of Perez, Attorney Rainen presented an additional theory about why the 1901 Compilation Plan and other registered documents did not and could not provide Perez with notice of a passageway easement. According to this theory, the 1901 Compilation Plan was simply a mistaken compilation of the three separate subdivision plans for Lots 91, 92, and 95, prepared by the Land Court Survey Department during the early days of the land registration system and unsupported by any independent grant, reservation, or decree of the Land Court establishing the passageways. Instead, the theory goes, the three subdivision plans, each showing a passageway easement, were temporary in nature and intended only for the limited purpose of securing Kenealy's right to access the rear or interior lots while he owned Lots 91, 92, and 95, and also granted certain mortgages. 





 While these points merit some consideration, I draw a different conclusion. For the reasons discussed in the Dubinsky Decision and as set forth below, I conclude that Kenealy intended the three subdivision plans and 1901 Compilation Plan to create permanent passageway easements for the benefit of the rear and otherwise landlocked lots. "It is well established that 'where land is conveyed with reference to a plan, an easement is ... created only if clearly so intended by the parties to the deed.'" Jackson, 418 Mass. at 712, quoting Scagel v. Jones, 355 Mass. 208 , 211 (1969). As detailed above, the Recorder entered his notation on the back of the 1901 Compilation Plan on March 13, 1901, coincident with the issuance of Certificate of Title No. 252 to Kennett (whereby Kenealy conveyed the rear or interior lots, Lots 91B, 92B, and 95A), and well before the issuance of Certificate of Title 253 on March 30, 1901 (whereby Kenealy took title to the front lots, Lots 91A, 92A, and 95B). Consideration of the registration documents indicates that the 1901 Plan was contemporaneously understood by Kenealy, his grantees, and all subsequent successors to create permanent passageway easements for the benefit of the rear lots. Duddy, 75 Mass. App. Ct. at 67-68. "[T]he purpose and effect of a reference to a plan in a deed, is a question of the intention of the parties." Regan v. Boston Gas Light Co., 137 Mass. 37 , 43 (1884). Wellwood v. Havrah Mishna Anshi Sphard Cemetery Corp., 254 Mass. 350 , 354 (1926). This reasoning is consistent with that of the Dubinsky Court, which explained: 





 When the decree of the Land Court of March 13, 1901, was extended on the [1901 Compilation Plan] and the [1901 Compilation Plan] decree were made a matter of public record, some easement of passage over the passageways shown on the plan on the lot now owned by the plaintiff became appurtenant to lots 91B and 92B now owned by the defendants. The reason for this is that on the [1901 Compilation Plan] the lots 91B and 92B were back lots not abutting on any public way. Lot 91B was utterly inaccessible unless having easement of egress and ingress over some passageway shown on the [1901 Compilation Plan].... [W]e think it plain as matter of construction of the [1901 Plan] and accompanying decree that rights of passage over some of the 'ways referred to or appearing' on the [1901 Compilation Plan] were created as appurtenant to lots 91B and 92B. 





Dubinsky, 261 Mass. at 54. 





 For the reasons discussed above, I concur with Plaintiffs that Perez and likewise Pacheco are charged with notice that Lots 91A and 92A were subject to passageway easements. Examination of the Pacheco deed and the registration plans and other available documents at the time of their purchases would have disclosed the five (5) foot passageways leading from Union Street to the rear lots. Reasonable purchasers were on notice that there were easements burdening the front properties. 





 Several questions remain. Did Plaintiffs and their predecessors in interest abandon the passageways? What is the scope of the passageway rights? Is use of the passageways overloaded when extended for the benefit of Lot B? I turn to those questions now. 





 B. Abandonment 





 Defendants bears the burden of proof on the issue of whether the passageway easement has been extinguished. Proulx v. D'Urso, 60 Mass. App. Ct. 701 , 704 n.2 (2004) ("[T]he burden on the owner of a servient estate to establish an intent to abandon an easement by the owner of the dominant estate is heavy ...."). "An express easement can be extinguished only by grant, release, abandonment, estoppel or prescription." Emery v. Crowley, 371 Mass. 489 , 495 (1976). The Supreme Judicial Court in Cater v. Bednarek cited approvingly to § 7.4 of the Restatement, entitled "Modification or Extinguishment by Abandonment." 462 Mass. 523 , 528 n.15 (2012). That section states: "A servitude benefit is extinguished by abandonment when the beneficiary relinquishes the right created by a servitude." Restatement (Third) of Property: Servitudes § 7.4 (2000). As stated by the Cater court, "[a]bandonment of an easement requires a showing of intent to abandon the easement by acts inconsistent with the continued existence of the easement." Supra at 528 n.15. The necessary showing has also been described as proof of "acts by the owner of the dominant estate conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its further existence." First Nat'l Bank v. Konner, 373 Mass. 463 , 466-467 (1977), quoting Dubinsky, 261 Mass. at 57. 





 The issue is one of intent. Desotell v. Szczygiel, 338 Mass. 153 , 158 (1958) ("[W]hether there is an abandonment is a question of intention."). Delconte v. Salloum, 336 Mass. 184 , 188 (1957), quoting Les V. Alibozek, 269 Mass. 153 , 158-159 (1929). Intent is to be "ascertained from the surrounding circumstances and the conduct of the parties." Carlson v. Fontanella, 74 Mass. App. Ct. 155 , 158 (2009). See Sindler v. William M. Bailey Co., 348 Mass. 589 , 592 (1965) (setting forth that abandonment "can be shown by acts indicating an intention never again to make use of the easement in question"). "Any deliberate conduct on the part of the dominant owner inconsistent with the continued existence of the easement may operate as abandonment...." Proulx, 60 Mass. App. Ct. at 704 n.2. 





 Based on the evidence presented at trial, I cannot conclude that Plaintiffs and their predecessors in interest (as owners of the dominant estate) conclusively and unequivocally manifested an intent to relinquish the passageway easements nor acted purposefully and inconsistently with the continued existence of those easements. Perez's argument for abandonment focused on the appearance of the old rusty chain link fence and the fact that several tall and apparently quite old trees grow up and at least one of those trees had grown through the old chain link fence between Plaintiffs' and Defendants' properties. However, those trees are not located in the portion of the fence running across the passageway easements. To the contrary, the present day circumstances are much like those almost one hundred years ago when the Dubinsky master reported: "I find, upon all the evidence and upon view of the premises, that from the appearance of the lay-out of the land and the buildings the owners did not know of, or disregarded, the existence of the passageways and each fenced in his own property." Master's Report, Middlesex, ss. No. 5491, Eq., p. 5. As was true in 1925, these facts are insufficient to establish intentional abandonment. The Dubinsky Court determined that plaintiff Dubinsky did not make out a claim of abandonment by the defendants of their easements as a matter of law, because "mere nonuser of an easement created by grant does not show abandonment." I reach the same conclusion today. 





 C. Scope of Passageway Easements 





 Notwithstanding my determination that two express easements continue to burden the Perez and Pacheco Properties, the scope of those easements must be determined. The law governing the construction of express grants of easements has been repeatedly stated: the goal is to ascertain the presumed intent of the grantor by reference, first and foremost, to the language of the grant and then, if necessary, to then-existing circumstances. See Pearson v. Bayview Assocs., Mass. App. Ct., No. 17-P-428 (Feb. 23, 2018), quoting Sheftel v. Lebel, 44 Mass. App. Ct. 175 , 179 (1998) ("The basic principle governing the interpretation of deeds is that their meaning, derived from the presumed intent of the grantor, is to be ascertained from the words used in the written instrument, construed when necessary in the light of the attendant circumstances."). Adams v. Planning Bd., 64 Mass. App. Ct. 383 , 389 (2005), quoting Boudreau v. Coleman, 29 Mass. App. Ct. 621 , 629 (1990) (determining the existence and attributes of a right of way requires looking "to the intention of the parties regarding the creation of the easement or right of way, determined from 'the language of the instruments when read in light of the circumstances attending their execution, the physical condition of the premises, and the knowledge which the parties had or with which they are chargeable'"). "When the language of the applicable instruments is 'clear and explicit, and without ambiguity, there is no room for construction, or for the admission of parol evidence, to prove that the parties intended something different.'" Hamouda, supra, 66 Mass. App. Ct. at 25 (2006), quoting Cook v. Babcock, 61 Mass. 526 , 528 (1851). 





 In this regard, the two 1901 subdivision plans for each of Lots 91 and 92 are instructive. The subdivision plan for Lot 91, accepted for registration on May 8, 1900, depicts a single five-foot wide passageway running northeasterly ninety (90) feet from the street Union Street along Lot 91A to Lot 91B at the rear and states that it is "mutually agreed that the 5 ft. passageway referred to in said deed is located as shown on said plan." Likewise, the subdivision plan for Lot 92, accepted for registration on September 12, 1900, shows a five-foot wide passageway running northeasterly ninety (90) feet across Lot 92A from as Union Street to Lot 92B at the rear. [Note 17] When shortly thereafter Kenaly conveyed the rear lots to Kennet and took title to the front lots he did so with reference 1901 Compilation Plan, which again depicted the two five-foot wide passageways. The appearance of the passageways on these plans is consistent with what we can discern from the Dubinsky Case, some two decades later. The Dubinsky Decision described the circumstances then before the court as much like the current lay of the land, specifically, that "from the appearance of the lay-out of the land and buildings the owners did not know of, or disregarded, the existence of the passageways and each fenced in his own property." 261 Mass. at 53. No evidence of vehicular use was apparent. The master in the Dubinsky case reported a chicken coop on Lot 92B, not a vehicle or vehicles. 





 In this context, I consider the burden of proving the existence, nature and extent of an express easement. That burden lies with the party asserting the easement, here the Plaintiffs. Hamouda, supra, 66 Mass. App. Ct. at 24 n.1. As such, it is Plaintiffs' burden to prove, by a preponderance of the evidence, that the disputed passageway easements were intended to be used for vehicular travel. See Moore v. Greeley, 16 LCR 679 , 680 (2008) (Misc. Case No. 316972) (Piper, J.) (featuring a thoughtful discussion of indicia distinguishing pedestrian rights of way from those used for vehicular passage). 





 Plaintiffs presented little, if any, evidence as to the scope or usage of the passageways across Lots 91A and 92A in recent history. Evidence that the passageways were actually used to access Lots 91B and 92B was scant. There was no evidence of any type of use when Meninger and Gomez owned their properties. In the past ten years or so, there may have been some effort to open the fences across the passageway easements first by Tchiengang and Diboty and then by Plaintiffs, but that evidence was inconclusive and any use intermittent. While most of the photographs show a fence installed across the passageway easements, there is only a single unidentified black and white photograph showing a car in the backyard of the Plaintiffs' Property between a gap in the two fences. Although that photograph was an agreed-upon exhibit, the date is unknown, as is the identity of the photographer and circumstances. That meagre documentary evidence is all that was before the court to suggest that a car might once have travelled along the easements to reach the rear lots. In sum, Plaintiffs have failed to establish that the car in the undated photograph or any other vehicle for that matter ever traversed the passageway easement to reach Lot 95A. 





 None of the witnesses testified as to any vehicular use of the easements. Gomez testified that when he owned both of the Francis Street properties (front and back) and before he installed the white vinyl fence, he could drive a car up the Francis Street Driveway (the ROW), squeeze past the three-family dwelling into the backyard (the white vinyl fence now obstructs that pathway). Meninger, the prior owner of Lot 91A (and whose father had owned the property beforehand, beginning in 1974) provided relatively independent testimony that he had no memory of a gate in the old chain link fence and never saw the metal fence open. As detailed above, both Meninger and his father were firemen and his father referred to the Passageway as a "fireman's easement." He testified, "I never gave it any thought ... because nobody ever approached us to use it." Although Meninger conceded that he did remove a five-foot portion of the fence contemporaneous with resolving the Malden District Court Case, he testified, and I credit this explanation because he had no reason not to testify truthfully at trial and had good reason to agree to remove the fence portion to facilitate the sale of Lot 91A, that he removed a portion of the fence because he wanted to sell his property. Consistently, Sacco conceded on cross-examination that Meninger told him that he was aware that the Passageway existed, but that "no one has ever used it." 





 Lastly, I find the layout and topography to be significant. In the first instance, neither of the two distinct and narrow five-foot wide easements is wide enough to accommodate a vehicle, indicating that only pedestrian access was intended. As to topography, Meninger testified that the rear lots were only recently paved with bitumen. He testified that the backyard of Plaintiffs' Property (Lots 91B, 92B, and 95A) used to be "like a big yard ... it wasn't a hot top back then." Gomez concurred, testifying that when he first owned 73A-75A Francis Street the backyard was grassy and at a somewhat higher elevation than Defendants' properties. As detailed above, one photograph taken by David Sacco in or about the time that he removed the gates also showed that the ground on the Defendants' properties was also grassy in the area of the Passageway, with no tire tracks or other marks of disturbance. In sum, the evidence before me was inconsistent with use of the passageway easements for vehicular travel. The great weight of the evidence, such as it exists, is that the passageway easements were not used for vehicular traffic, nor the rear lots for parking. 





 Based on the evidence presented at trial, I conclude that Plaintiffs have not met their burden of establishing that the passageway easements were ever intended or used for vehicular access. See Moore, 16 LCR at 68.1. I conclude that the passageway easements were never intended for vehicles, rather the use is limited to pedestrian access. 





 D. Overloading 





 I turn now to the question of whether use of the passageway easements across Lots 91A and 92A to reach Lot B overloads those easements. It is well-established in Massachusetts that, absent the consent of the owner of the servient estate, the use of an appurtenant easement to benefit property located beyond the dominant estate constitutes an overloading of that easement. Taylor, 475 Mass. at 686 (2016), quoting Murphy, 348 Mass. at 678-679 ("A right of way appurtenant to the land conveyed cannot be used by the owner of the dominant tenement to pass to or from other land adjacent to or beyond that to which the easement is appurtenant."). In Taylor, the Supreme Judicial Court affirmed the long-standing, bright-line rule in Murphy, and disallowed an argument that a fact-intensive inquiry be undertaken on a case-by-case basis. Taylor, supra at 683. 





 The two subdivision plans for each of Lots 91 and 92 were registered in 1900 and combined in the 1901 Compilation Plan a year later. Each of the subdivision plan shows the passageway across the larger, front portion of the lot, to reach the smaller, rear portion or interior lot. Neither subdivision plan indicates any intent or purpose other than to permit passage from Union Street (then Webster Street) to the rear or interior lot. The passageways as depicted terminate when they reach the rear or interior lot. Accordingly, absent the consent of the owner of the front lots (the servient estates), the use of these appurtenant easements to benefit property located beyond the rear lots (the dominant estates) constitute as overloading of those passageway easements. 





 Here, Plaintiffs seek the right to use the passageway across Lot 92A not just to reach Lot 92B, but also to reach Lot 95A and the three-family dwelling on Lot B. In 1925, the Dubinsky Court did not take issue with defendants Camas' use of the passageway across Lot 92A to reach not only Lot 92B, but also the two other rear lots owned by the Camas, Lots 91B and 95A. The situation before the court today is far different from that before the Dubinsky Court because, in the 1940's, Lot B was joined in common ownership with the interior or rear lots (Lots 91B, 92B, and 95A). Today, a three-family dwelling is constructed on Lot B and the rear lots essentially serve as a backyard for that dwelling. For practical purposes, Plaintiffs seek the right to use the passageways easements to drive from Webster Street to the backyard and park those vehicles there, all for the benefit of the tenants of the three-family house located on Lot B. 





 In their supplemental filing on the overloading issue, Plaintiffs suggest that once the residents of the dwelling on Lot B exit their vehicles in the backyard lots, they could then walk around to the front door of 73A-75A Francis Street (instead of presumably using a back door adjacent to their vehicles) and that so doing would not overload the passageway easements. I disagree. Such expanded use, even though improbable, is inconsistent with the layout of the 1901 Compilation Plan and was never contemplated at the time of the creation of the passageway easements. The 1901 Compilation Plan was simply that, a "compilation" only of three subdivision plans and was never intended to create new or expanded easement rights to serve or benefit a parcel of land beyond the original subdivision plan of 1899. I conclude that use of the passageway easements running from Union Street across Lots 91A and 92A to benefit property other than Lots 91B and 92B respectively constitutes an overloading of those easements. 





CONCLUSION 





 For the reasons stated above, I find that Plaintiffs are entitled to a declaratory judgment that their Lots 91B and 92B have the benefit of two five-foot wide express passageway easements as registered running from Union Street across the properties of defendants Jean Pacheco and Miguel Perez, with addresses of 124-126 Union Street and 128-130 Union Street, respectively (Lots 91A and 92A), Everett. In addition, I find that the two passageway easements are available for pedestrian access only, such that a gate must be provided for access, but not for vehicular access, and further find that the passageway easements may not be used to access Plaintiffs' Lot B or the dwelling thereon with an address of 73A-75A Francis Street, Everett. Judgment to enter accordingly. 





SO ORDERED. 





FOOTNOTES
[Note 1] Plaintiffs' Post-Trial Brief (page 18) states clearly that Plaintiffs are not attempting to enforce the agreement for judgment against Perez, who was not properly a party to that case. 

[Note 2] A sketch prepared by the Land Court Survey Department and annexed hereto shows the various properties at issue, compiled into a single sketch ("Decision Sketch"). 

[Note 3] The 1899 Plan (or Plan 21J) lays out an area designated as Section D on the original registration plan for Land Court Case No. 21 entitled "Carter Farm and Herd estate in Chelsea and Everett, Mass.," dated November 1, 1891, by Joseph R. Cart Engineer. 

[Note 4] Those restrictions established setbacks for buildings constructed on the lots and restricted building materials and design. 

[Note 5] Plaintiffs' Post-Trial Brief acknowledges in footnote 3 that "Lot B holding the structure for the current property, at this time, was into included in this lawsuit [the Dubinsky Case] and was not commonly owned until the 1940's." 

[Note 6] On cross-examination, Gomez conceded that he and Perez are "good neighbors." Tr. Vol. II, at 449. I conclude that although Gomez was favorably disposed to assist his neighbor Perez, his testimony was truthful and credible. I reach this conclusion based on his extremely detailed testimony about the properties at issue, which was consistent with my observations and contemporaneous photographs, as well as his direct answers to questions. 

[Note 7] While a copy of an older black and white photograph does show a car parked in the backyard of the Plaintiffs' Property, between a gap in the two fences, no witness was able to provide the date or explain the context; its origins are unknown and the content unreliable. Tr. Ex. 15, page 1 and 18. 

[Note 8] This court permitted testimony about the Malden District Court case for the limited purpose of showing the knowledge and understanding of the signatories to the agreement for judgement and not for the purpose of establishing rights in the Passageway or a conveyance or transfer of property rights, because the Malden District Court lacked jurisdiction to adjudicate rights in the registered land. Disputed Tr. Ex. D. 

[Note 9] As noted above, a copy of a black and white photograph shows a vehicle parked in the backyard and may be from this timeframe. Although the photograph was an agreed upon exhibit, no witness was able to explain who took the photograph or when or in what context it was taken. Tr. Ex 15, page 1, and Tr. Ex. 18. 

[Note 10] Section 17 of Chapter 184 of the General Laws provides, in pertinent part: "A judgment or decree, at law or in equity, rendered after June eighth, eighteen hundred and ninety-two, affecting the title to real property, shall not have any effect except against the parties thereto, their heirs and devisees and persons having actual notice thereof, unless a certified copy of the record thereof has been recorded in the registry of deeds for the county or district where the land lies, with a memorandum of the town where the land lies and a description thereof sufficiently accurate for identification if the record of the judgment or decree does not give those particulars."' 

[Note 11] These facts are set forth with reference to the Dubinsky Decision, the Land Court Survey Department File and the Master's Report in the Dubinsky Case, Middlesex Superior Court No. 5491. Tr. Ex. 31. 

[Note 12] "We make no determination concerning the right of way on Lot 91A, as that is in no way before us ...." Id. 

[Note 13] The master reported: "Owing to the location of a certain hencoop on Lot 92B, the plaintiff [Dubinsky] believed that lot 92B was part of lot 91A." Id. 

[Note 14] The master reported: "The actual appearance of the land and buildings, viewed from either Malden or UnIon Streets, would indicate that the previous owners fenced in their particular lots without regard to any passageway rights." Further: "I find, upon all the evidence and upon view of the premises, that from the appearance of the lay out of the land and the buildings the owners did not know of, or disregarded, the existence of the passageways and each fenced in his own property." 

[Note 15] Further: "As a matter of construction and interpretation of the (1901 Compilation Plan] and decree of the land court thereon, we think that the plaintiff's lot was made subject to the two rights of passage already described (one of which is not relevant here]. His certificate of title in terms made the lot subject to the right of way' shown on the [1901 Compilation Plan). The [1901 Compilation Plan) was thus incorporated in the certificate of title as much as if attached thereto. The principle of construction governing the interpretation of deeds is that where mention is made of an easement as an incumbrance or as an appurtenance of the land conveyed and reference is made in the deed to a plan, the plan must be considered as part of the deed, so far as is necessary to aid in the description and identification of the easement." Id. 

[Note 16] Pacheco, on the other hand, did have actual knowledge of the easement across Lot 91A, since his deed described the property with reference to Certificate of Title 253 (Plan No. 21) and stated: "The above described land is subject to rights of said passageway." I conclude, however, that he did not have actual knowledge about the Malden District Court case or the agreement for judgment and therefore is not bound by its terms. In this regard, Meninger, who sold Lot 91 A to Pacheco, concurred that he never told Pacheco about the Malden District Court case or the agreement for judgment. Notably, there was a delay after the execution of the deed to Pacheco (June 8) and its registration (July 19), during which the agreement for judgment was executed and filed (June 27 and July 17). 

[Note 17] The subdivision plan for Lot 92, as well as the 1901 Compilation Plan, show a second three foot wide passageway easement running from Union Street across Lot 92A to the rear lot 92B on the opposite side of Lot 92A, while the subdivision plan for Lot 95 and the 1901 Compilation Plan also includes a five (5) foot wide passageway easement across Lot 95B to reach the rear Lot 95A. In total, four distinct passageway easements provide access to the three rear lots, all of which are adjacent to one another. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.